**UNITED STATES of America, Plaintiff,**

v.

**Aaron L. KIMBALL, Defendant.**

**Crim. No. 92–78–P–C–02.**

United States District Court,
D. Maine.

Feb. 5, 1993.

George T. Dilworth, Asst. U.S. Atty., Portland, ME, for plaintiff.

Peter Clifford, Kennebunk, ME, for defendant.

MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, Chief Judge.

On November 18, 1992, a federal grand jury returned an indictment against Defendant, Aaron L. Kimball, charging him with burglarizing the Post Office in North Waterboro, Maine, on or about October 2, 1992. *See* 18 U.S.C. §§ 2115, 2. Defendant filed a motion seeking an order suppressing 1) the physical evidence seized from the car in which he was riding and 2) all statements made to police by his co-defendants. (Docket No. 8) Based on the evidence presented at the hearing, the Court concludes that the Motion to Suppress should be denied.

## FACTS

In late September of 1992, there were a series of night-time school burglaries in western York County, Maine. A Crime Bulletin was issued by the York County Sheriff's Department and distributed to all deputies in the Department. Government's Exhibit 1. Handwritten on the bottom of the Crime Bulletin were the names "Huertas" and "Kimball." [1]

Shortly after midnight on October 3, 1992, York County Deputy Sheriff Thomas Word saw an automobile in the Massabesic High School parking lot. As the vehicle pulled out of the parking lot Deputy Word recognized the car as belonging to Gregory Huertas. He knew Huertas had previously been convicted of burglary and knew also that he was a suspect in the recent burglaries. Deputy Word pulled the Huertas vehicle over. Per Department procedure, Deputy Word advised the York County dispatcher that he had just stopped a suspicious vehicle that was seen in the school parking lot. When Deputy Word approached the car, he saw a crowbar [2] and flashlight sticking out of a bag on the floor in the back seat. Upon reaching the front seat, Deputy Word saw that Huertas was in the driver's seat, and a man he knew to be Aaron Kimball was in the right front seat. A man he subsequently learned to be Michael R. Brochu was sitting in the middle of the other two men in the front seat.

Deputy Word requested Huertas's license and returned to his vehicle to run a license check. Before getting the status of the license, Deputy Word returned to the car and requested that Huertas step out of the vehicle. At this point, several other police officers arrived at the scene and informed Deputy Word that Huertas's license to operate an automobile was suspended. [3] Among the officers who arrived at the scene was Patrol Supervisor Deputy Philip A. Weymouth. Huertas was arrested for Operating After Suspension and was taken to the York County Sheriff's office. Kimball and Brochu agreed to go to the York County Sheriff's Office, where they were interviewed separately.

After being informed of their constitutional rights as set forth by *Miranda*, Huertas and Brochu admitted that they had burglarized the North Waterboro Post Office earlier that evening. Kimball refused to speak to any of the officers and did not make a statement. Back at the scene, Deputy Weymouth conducted an inventory of Huertas's vehicle before it was towed. The tools found in the vehicle included a two crowbars, a flashlight, a hammer, a pair of bolt cutters, and assorted screwdrivers.

## DISCUSSION

### A. Stop of Huertas's Vehicle

Defendant contends that there was no reasonable suspicion to stop the Huertas

---

**1.** According to the testimony it is standard practice at the York County Sheriff's Department to write the names of suspects on the bottom of the Crime Bulletin. No evidence was presented regarding who wrote the names on the bottom of the Crime Bulletin.

**2.** Deputy Word testified that when he saw the crowbar he thought of the Crime Bulletin which listed a pry bar as the *modus operandi* for committing the burglaries.

**3.** The dispatcher had attempted to notify Deputy Word that Huertas's license was suspended, but apparently Deputy Word was out of his vehicle and did not hear the dispatcher.

vehicle. The Government counters that Deputy Word had reasonable suspicion to believe that criminal activity was afoot.

The Fourth Amendment is not a guarantee against all searches and seizures, but only against unreasonable searches and seizures. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). In *Terry v. Ohio*, 392 U.S. 1, 25–27, 88 S.Ct. 1868, 1882–83, 20 L.Ed.2d 889 (1968), the Supreme Court recognized that the Fourth Amendment does not prohibit encounters between police officers and citizens based on less than probable cause for arrest. The Court in *Terry* held that marginally intrusive encounters, which fall short of full scale arrests, require a reasonable suspicion proportional to the degree of intrusion. *Id.* at 19, 88 S.Ct. at 1878.

■ The Supreme Court has enunciated a dual inquiry for evaluating the reasonableness of a *"Terry* stop." A court reviewing police action must inquire:

> Whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*Sharpe*, 470 U.S. at 682, 105 S.Ct. at 1573 (quoting *Terry*, 392 U.S. at 23, 88 S.Ct. at 1881). *See also United States v. Walker*, 924 F.2d 1, 3 (1st Cir.1991).

■ A determination of whether the stop was justified at the outset depends on the totality of the circumstances confronting the officer. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Weight is given "to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. *See also Walker*, 924 F.2d at 3–4. Clearly, police officers possessing a reasonable and articulable suspicion that a person is engaged in criminal activity may conduct a brief stop of an automobile to investigate. *Cortez*, 449 U.S. at 421–22, 101 S.Ct. at 697; *United States v. Rodriguez–Morales*, 929 F.2d 780, 784 (1st Cir.1991), *cert. denied*, ——

U.S. ——, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).

■ Among the articulable factors which Deputy Word considered was the fact that a vehicle was in the school parking lot shortly after midnight, long after any school-related functions had ended. Location alone, however, is insufficient to justify a *"Terry* stop." *See Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Trullo*, 809 F.2d 108, 111 (1st Cir.1987), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). A second articulable factor was that Deputy Word knew from the Crime Bulletin that a number of schools in the area had recently been burglarized at night. Thus, the presence of a car, in close proximity to a school, late at night, not in conjunction with any school-related function, was, in light of the officer's knowledge of the recent local pattern of burglaries at public schools, an additional suspicious circumstance.

Finally, the Deputy recognized the car as belonging to Huertas, whom he knew had been previously convicted for burglary, and whose name was listed on the Crime Bulletin as a suspect. The Court finds that the totality of the circumstances—the presence of a vehicle, owned by a burglary suspect, in a otherwise deserted high school parking lot at midnight, at a time when a number of area schools had been burglarized at night—gave rise to an articulable, reasonable suspicion of criminal activity, justifying Deputy Word's initial stop of the Huertas vehicle.

■ The inquiry does not end here, however. The next issue is whether the action taken by the Deputy Sheriffs was reasonably related in scope to the circumstances precipitating the stop. *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *United States v. Stanley*, 915 F.2d 54, 55 (1st Cir.1990). Defendant argues that the stop was of unreasonable scope and duration. The essence of Defendant's argument is that because he did not feel that he was free to leave the scene of the stop, he was taken to

the station for questioning involuntarily.[4] In light of the evidence presented at the hearing, the Court finds that Kimball voluntarily consented to go to the station to talk to the officers.

After seeing the crowbar in plain view in the back seat, the police had reason to want to question Kimball and Brochu about the recent burglaries. Deputy Weymouth testified that it is Department policy not to engage in detailed interviews on the side of the road and therefore Kimball and Brochu were asked if they would agree to go to the station to answer some questions. The evidence does not show that Kimball was coerced or threatened into agreeing to go to the station. The Court concludes that, where, as here, the detention was initially lawful, Kimball's consent to go to the station was effective to permit the questioning away from the scene. Accordingly, the "*Terry* stop" ended when Kimball gave his consent to go to the station.

In this case, the "*Terry* stop" lasted long enough to establish the identities of the occupants of the car, inquire about their presence on school grounds at that late hour, and determine the status of Huertas's license. After it was determined that Huertas was operating the vehicle after suspension of his license, he was placed under arrest. Shortly thereafter, Brochu and Kimball were asked if they were willing to go to the station to answer some questions. Clearly, the limited scope of the stop was reasonably related to the investigation and did not last too long or create excessive intrusion into Defendant's privacy interest.

## B. Seizure of the Tools

■ For purposes of this motion alone, Defendant claims a possessory interest in the tools found in the back seat of the Huertas vehicle. Defendant contends that the seizure of the tools violated the Fourth Amendment. The Government contends, *inter alia,* that the search and seizure of the items in the vehicle was justified as an inventory search. Because the Court finds that the tools were seized as part of a lawful inventory search of the vehicle, it is unnecessary to address the Government's alternative arguments.

Deputy Weymouth testified that when the driver of a vehicle is arrested, it is Department policy to have the vehicle towed, rather than leaving it abandoned on the roadside. When a car is to be towed, the York County Sheriff's Department policy requires that the vehicle be searched and its contents inventoried. The reasons set forth in the policy to inventory a vehicle are: 1) to protect the owner's property while it is in police custody; 2) to protect the police against claims of lost or stolen property; and 3) to protect the police and the public from potential danger. Government Exhibit 3 (York County Sheriff's Office Motor Vehicle Inventory Policy). *See also Colorado v. Bertine,* 479 U.S. 367, 374–75, 107 S.Ct. 738, 742–43, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,*

---

**4.** The implication of this argument is that, because Kimball was not told that he was free to leave, he considered himself seized. This argument is erroneous. The encounter between Kimball and the officers did not become a seizure merely because the officers did not tell the Defendant that he was free to leave or to refuse to comply with their requests. *See INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *U.S. v. Analla,* 975 F.2d 119, 124 (4th Cir.1992). While it is true that the officers did not inform Defendant that he could leave, this is not a *sine qua non* to finding that a seizure occurred.

The Fourth Amendment's proscription against unreasonable seizures is implicated if an "officer, by means of physical force or show of authority, … in some way restrain[s] the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). In *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), a plurality of the Supreme Court held that a person is seized "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Thus, it is irrelevant whether a particular defendant feels intimidated or at ease. The free-to-leave standard is an objective test, concerned with whether a reasonable person under the circumstances would feel he could leave. The Court finds nothing to indicate that Kimball was not free to leave, or that he was coerced, which would indicate that he could not refuse to go to the station. Therefore, no seizure occurred.

428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976).

In this case, Deputy Weymouth inventoried the vehicle in accordance with local police procedure. Inside the vehicle he found, among other items, an open bag on the floor in the back seat of the vehicle.[5] Sticking out of the bag he could see a crowbar. Inside the bag, the Deputy found two crowbars, a flashlight, a hammer, a pair of bolt cutters, and assorted screwdrivers. All of these items were listed on an inventory sheet. Government's Exhibit 2. After completing the inventory of the vehicle, Deputy Weymouth had the vehicle towed.

There was no evidence that the officer, who was following standardized procedures, acted in bad faith or for the sole purpose of investigation in conducting the inventory of the Huertas vehicle. The Sheriff's Department's procedures mandates the inventory of all towed or impounded vehicles. Thus, this Court holds that the car was properly and lawfully searched as part of a routine inventory pursuant to police procedures.

### C. Statements Made by Huertas and Brochu

Finally, Kimball seeks to suppress the "statements" and "confessions" made by Huertas and Brochu on the ground that they are "fruit of the poisonous tree" of the allegedly improper stop.[6] The short and dispositive answer to this contention is the Court's conclusion, *supra,* that there was no impropriety in the *Terry* stop. Because the Court has upheld the stop, Defendant cannot prevail on the ground that the statements are fruit of the poisonous tree.

---

**5.** Kimball contends that the bag holding the burglary tools was zipped shut. The only testimony presented on this issue was by Deputies Word and Weymouth. Each deputy testified that he could see the crowbar sticking out of the bag. Therefore, the Court concludes that the bag was open.

**6.** By positing the argument in these terms, Kimball overlooks that Fifth Amendment rights are

The Motion to Suppress is therefore *DENIED.*

personal to an individual and may not be vicariously asserted. *See e.g., Bellis v. United States,* 417 U.S. 85, 89–90, 94 S.Ct. 2179, 2184, 40 L.Ed.2d 678 (1974); *United States v. McDowell,* 918 F.2d 1004, 1007 (1st Cir.1990). Therefore, Kimball does not possess the requisite standing to suppress any of the statements made by Huertas and Brochu to the police.