USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1755 UNITED STATES OF AMERICA, Appellee, v. AARON KIMBALL, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Torruella and Stahl, Circuit Judges. ______________ _____________________ Peter Clifford, by Appointment of the Court, for appellant. ______________ Margaret D. McGaughey, Assistant United States Attorney, ______________________ with whom Jay P. McCloskey, United States Attorney, and George T. ________________ _________ Dilworth, Assistant United States Attorney, were on brief for ________ appellee. ____________________ May 23, 1994 ____________________ TORRUELLA, Circuit Judge. Aaron Kimball was charged in _____________ a single count indictment with burglarizing a United States Post Office in North Waterboro, Maine, on October 2, 1992, in violation of 18 U.S.C. 2115 and 2. Kimball moved to suppress 1) physical evidence seized from the car in which he was riding and 2) all statements made to police by his codefendants on October 3, 1992, the morning of his arrest. The district court denied Kimball's motion. Kimball then entered a conditional plea of guilty to the indictment. Kimball now appeals the district court's denial of his motion to suppress. We affirm. I. BACKGROUND I. BACKGROUND __________ A. Facts A. Facts We view the facts in the light most favorable to the district court's ruling with respect to Kimball's motion to suppress. See United States v. Maguire, 918 F.2d 254, 257 (1st ___ ______________ _______ Cir. 1990), cert. denied, 499 U.S. 950 (1991). ____________ There were four night-time burglaries of schools and a church in western York County, Maine in late September 1992. The York County Sheriff's Department issued a crime bulletin related to these burglaries and distributed it to deputies in the Sheriff's department. The names "Huertas" and "Kimball" were handwritten on the bottom of the bulletin. It was apparently standard practice of the York County Sheriff's Department to write the names of suspects on the bottom of crime bulletins. No evidence was presented, however, as to specifically who wrote the names on the bottom of the bulletin or why these two men were -2- thought to be suspects. The bulletin stated that the same modus _____ operandi was used in all four burglaries: using a crow bar to pry ________ doors, latches, and file cabinets open. Just after midnight on October 3, 1992, Deputy Thomas Word saw an automobile in the Massabesic High School parking lot. As the vehicle pulled out of the school parking lot, Deputy Word recognized the vehicle as belonging to Gregory Huertas. Deputy Word knew that Huertas had previously been convicted of burglary, and that Huertas was a suspect in the recent burglaries. Deputy Word then pulled the vehicle over, and advised the York County dispatcher that he had stopped a suspicious vehicle that had been on school property. Deputy Word then approached the vehicle and saw Huertas in the driver's seat and Kimball in the right front passenger's seat. A man later identified as Michael Brochu was sitting between Huertas and Kimball in the front seat. Deputy Word shined his flashlight into the car, at which point he saw a crowbar and flashlight on the floor in the back seat. Deputy Word requested that Huertas show him his license, Huertas complied, and Deputy Word returned to his car to run a license check. Before receiving a response from the dispatcher, Deputy Word went back to Huertas' vehicle and asked Huertas to step out of the car. Several other officers, including Deputy Philip Weymouth, arrived at the scene and informed Deputy Word that Huertas' license to operate an automobile had been suspended. Huertas was arrested and taken to the York County Sheriff's office. The deputies then asked -3- Kimball and Brochu whether they would also go to the Sheriff's office, and they agreed to do so. At the police station, after being given their Miranda _______ rights, Huertas and Brochu were interviewed separately. They both admitted that they had burglarized the North Waterboro Post Office earlier that evening. Kimball did not speak to any of the officers and did not make a statement. At the scene of the initial vehicle stop, Deputy Weymouth arranged to have Huertas' vehicle towed, and conducted an inventory search of the vehicle before it was towed. Deputy Weymouth recorded on the inventory form that he found two crowbars, a flashlight, a hammer, a pair of bolt cutters, and assorted screwdrivers in the vehicle. B. Proceedings Below B. Proceedings Below Kimball filed a motion to suppress the introduction of evidence of the tools found in Huertas' vehicle and the statements made by Huertas and Brochu, claiming that the evidence obtained was the fruit of an unconstitutional stop of the car in which he was riding. The district court denied the motion, finding that the circumstances reasonably justified Deputy Word's initial stop of Huertas' vehicle and the initial detention of the vehicle's occupants. The court found that the scope of the stop was limited and reasonably related to the reasons that justified it. The court also found that the tools were seized as part of a lawful inventory search of the car. Kimball now appeals the district court's denial of his -4- motion to suppress. Kimball contends that the district court erroneously concluded that 1) Deputy Word had the requisite reasonable suspicion necessary to stop Huertas' vehicle; 2) the stop was reasonable in its duration and scope; and 3) the physical evidence and incriminating statements were not legally attributable to an unlawful stop. II. KIMBALL'S FOURTH AMENDMENT CLAIM II. KIMBALL'S FOURTH AMENDMENT CLAIM ________________________________ A. Does Kimball Have Standing1 To Challenge the Stop? A. Does Kimball Have Standing1 To Challenge the Stop? As a threshold matter, the Government argues that Kimball lacks standing to challenge the constitutionality of the stop of Huertas' vehicle.2 We disagree. Fourth Amendment rights are personal, and a proponent of a motion to suppress must prove that the challenged governmental action infringed upon his own Fourth Amendment rights. United States v. Soule, 908 F.2d 1032, 1034 (1st Cir. _____________ _____ 1990) (citing Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978)). _____ ________ A police officer's act of stopping a vehicle and detaining its ____________________ 1 We use the term "standing" as a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged governmental action. "Technically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence for more than a decade, since the Supreme Court in Rakas v. Illinois, 439 U.S. 128 (1978), _____ ________ indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law." United States v. S nchez, 943 F.2d 110, 113 n.1 (1st Cir. 1991). _____________ _______ 2 The Government challenged Kimball's standing to bring this motion to suppress in the district court. The district court, however, elected to consider, and then rejected Kimball's Fourth Amendment claim on the merits without first determining whether Kimball in fact had standing. -5- occupants constitutes a seizure within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979); see ________ ______ ___ also Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450 ____ _______________________________ ____ (1990); United States v. Sharpe, 470 U.S. 675, 682 (1985). Such _____________ ______ a stop affects an occupant's interest in freedom from random, unauthorized, investigatory seizures. Prouse, 440 U.S. at 657. ______ An occupant's interest in avoiding the substantial anxiety that such stops may create is also affected. Id. __ When a police officer effects an investigatory stop of a vehicle, all occupants of that vehicle are subjected to a ___ seizure, as defined by the Fourth Amendment. The fact that a defendant is a passenger in a vehicle as opposed to the driver is a distinction of no consequence in this context. The interest in freedom of movement and the interest in being free from fear and surprise are personal to all occupants of the vehicle, and an individual's interest is not diminished simply because he is a passenger as opposed to the driver when the stop occurred. See ___ United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989). Both _____________ _____ driver and passenger: have their travel interrupted by the sight of a state patrol cruiser or police car looming large in the rear view mirror, are detained on the side of the road, have their identifying documents inspected by the trooper or policeman, and may even be asked to leave their vehicles for the duration of the questioning . . . . United States v. Powell, 929 F.2d 1190, 1195 (7th Cir.), cert. ______________ ______ _____ denied, 112 S. Ct. 584 (1991). Moreover, once a car is stopped, ______ -6- a passenger may feel no more free to leave the scene than the driver, without first being allowed to do so by the police officer. Erwin, 875 F.2d at 270 (citing Berkemer v. McCarty, 468 _____ ________ _______ U.S. 420, 436 (1984)). Rather, the passenger is subjected to the demands and control of the police officer, just as the driver is. Because a passenger's own interests are affected when the vehicle in which he is riding is stopped, he has standing to challenge the stop of that vehicle. United States v. Roberson, 6 F.3d _____________ ________ 1088, 1091 (5th Cir. 1993), cert. denied, 127 L.Ed.2d 574 (1994); ____________ Erwin, 875 F.2d at 270; United States v. Portwood, 857 F.2d 1221, _____ _____________ ________ 1222 (8th Cir. 1988), cert. denied, 490 U.S. 1069 (1989); United ____________ ______ States v. Durant, 730 F.2d 1180, 1182 (8th Cir.), cert. denied, ______ ______ ____________ 469 U.S. 843 (1984); see also Powell, 929 F.2d at 1194-95.3 ________ ______ Thus, if the initial stop of the vehicle was illegal, evidence seized by virtue of that stop, such as the tools in this instance, may be subject to exclusion under the "fruit of the poisonous tree" doctrine. See, e.g., Wong Sun v. United States, ___ ____ ________ _____________ 371 U.S. 471, 484-85 (1963). B. Was the Stop Constitutionally Valid? B. Was the Stop Constitutionally Valid? As a preliminary matter, we set forth the applicable ____________________ 3 The Government's reliance on Rakas v. Illinois, 439 U.S. 128 _____ ________ (1978), in the context of a stop, is misplaced. In Rakas, the _____ United States Supreme Court held that a mere passenger in an automobile ordinarily does not have the legitimate expectation of privacy necessary to challenge the search of that automobile. ______ Id. at 148-49. The Supreme Court's decision, however, was __ limited to the issue of whether the passenger's legitimate expectation of privacy was invaded by a search of the vehicle, and not the stop thereof. Id. at 150-51. (Powell, J., __ concurring). -7- standard of review. Whether police activity is reasonable in any particular context depends on the facts which are unique to that incident. See United States v. Rodr guez-Morales, 929 F.2d 780, ___ _____________ _________________ 783 (1st Cir. 1991), cert. denied, 112 S. Ct. 868 (1992). The ____________ trial court has a superior sense of what actually transpired during an incident, by virtue of its ability to see and hear the witnesses who have first hand knowledge of the events. Id.; see __ ___ also United States v. Karas, 950 F.2d 31, 35 (1st Cir. 1991). ____ ______________ _____ Appellate oversight is therefore deferential, and we review "the district court's findings of fact following a suppression hearing, including mixed fact/law findings, under the clearly erroneous test." Rodr guez-Morales, 929 F.2d at 783 (citations _________________ omitted). If the district court applies the wrong legal standard, however, no deference attaches to such an application. Id. __ Consistent with the Fourth Amendment, law enforcement agents may stop a moving automobile to investigate their reasonable suspicion that the vehicle's occupants were, are, or ____________________ will be engaged in criminal activity. United States v. Hensley, _____________ _______ 469 U.S. 221, 226 (1985); Berkemer v. McCarty, 468 U.S. 420, 439 ________ _______ (1984); Rodr guez-Morales, 929 F.2d at 784. _________________ Although stopping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on _______________________________ specific and articulable facts, may ___________________________________ outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion. -8- Hensley, 469 U.S. at 226 (emphasis supplied) (citing Prouse, 440 _______ ______ U.S. at 653-55). To evaluate the overall reasonableness of this type of stop, a "Terry stop", see Terry v. Ohio, 392 U.S. 1 _____ ___ _____ ____ (1968), the reviewing court must perform a two step inquiry: "the court must first consider whether the officer's action was justified at its inception; and second, whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. _____________ Walker, 924 F.2d 1, 3 (1st Cir. 1991) (citations omitted). It ______ should be kept in mind that when applying this test and assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. Walker, 924 F.2d at 3-4 ______ (citing United States v. Trullo, 809 F.2d 108, 111 (1st Cir. _____________ ______ 1987), cert. denied, 482 U.S. 916 (1987)). ____________ To initially justify a "Terry stop," "the police _____ officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21; _____ Walker, 924 F.2d at 3; Trullo, 809 F.2d at 110-11. In the ______ ______ present case, we agree with the district court that Deputy Word's stop of Huertas' vehicle was warranted at its inception. The record indicates that Deputy Word was able to articulate a number of factors that made him suspicious of Huertas' vehicle in the early morning hours of October 3, 1992. First, Deputy Word observed the vehicle in a school parking lot after midnight, long -9- after any school functions had ended. Second, Deputy Word knew by virtue of the crime bulletin, that a number of schools and a church in the area had been burglarized during the weeks immediately preceding the stop. Thus, as the district court noted, "the presence of a car, in close proximity to a school, late at night, not in conjunction with any school related function, was, in light of the officer's knowledge of the recent local pattern of burglaries at public schools, an additional suspicious circumstance." United States v. Kimball, 813 F. Supp. _____________ _______ 95, 98 (D. Maine 1993).4 A third articulable factor was that Deputy Word recognized the vehicle as belonging to Huertas, and he knew that Huertas had a criminal history involving burglaries. A police officer's knowledge of an individual's prior criminal activity is material to whether the officer reasonably suspects that criminal activity has or may be occurring. Cf. United __ ______ States v. Taylor, 985 F.2d 3, 6 (1st Cir.), cert. denied, 113 S. ______ ______ _____________ Ct. 2426 (1993) (an affiant's knowledge of the target's criminal record is material to the probable cause determination to issue a ____________________ 4 The names of Huertas and Kimball had been handwritten on the crime bulletin, identifying them as suspects in the burglaries. Because the Government failed to present any evidence as to who handwrote the names on the bulletin, or why Huertas and Kimball were considered suspects, we do not believe that this factor provides reasonable support for Deputy Word's stop of Huertas' vehicle. See Hensley, 469 U.S. at 233 ("Assuming the police make ___ _______ a Terry stop in objective reliance on a flyer or bulletin, we _____ hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin ______ possessed a reasonable suspicion justifying a stop . . . "). Deputy Word was justified, however, in relying upon the other information contained in the crime bulletin, and even without the identification of Huertas and Kimball as suspects, he was justified in stopping Huertas' vehicle on October 3, 1992. -10- warrant). Kimball contends that the record demonstrates that Deputy Word relied solely on the location of Huertas' vehicle to support his decision to stop Huertas' vehicle, and that this factor was legally insufficient to justify the stop. As support for this argument, Kimball relies on Brown v. Texas, 443 U.S. _____ _____ 47, 52 (1979), where the United States Supreme Court stated that location alone is insufficient to justify a "Terry stop." While _____ Kimball is correct that location in and of itself is insufficient to justify a "Terry stop," we have stated that location and the _____ type of area where the stop is made, is clearly a consideration that a police officer may use to decide to make a "Terry stop." _____ Walker, 924 F.2d at 4; Trullo, 809 F.2d at 111. Deputy Word was ______ ______ therefore reasonably entitled to consider the fact that the vehicle was located in the school parking lot. Moreover, as we have already noted, there were other factors which buttressed Deputy Word's decision to stop Huertas' vehicle. Therefore, we believe that the district court was correct in concluding that the factors articulated by Deputy Word, taken together, demonstrated that when he decided to stop Huertas' vehicle, he could have reasonably believed that a burglary was in process or was about to be committed.5 ____________________ 5 Kimball makes much of the fact that Deputy Word stated in one portion of his testimony that he did not believe that criminal activity was occurring when he decided to stop Huertas' vehicle, and based on this testimony, Kimball therefore concludes that Deputy Word had absolutely no basis to stop Huertas' vehicle. Kimball assigns too much weight to one portion of Deputy Word's testimony, and misconstrues the import of Deputy Word's -11- We now review whether the action taken by Deputy Word and the other York County deputies was reasonably related in scope to the circumstances which justified the stop. Walker, 924 ______ F.2d at 3. The district court concluded that the stop was reasonably related to the investigation and did not last too long or create an excessive intrusion into Kimball's privacy interests. Kimball, 813 F. Supp. at 99. The "Terry stop" lasted _______ _____ long enough for Deputy Word to establish the identities of the occupants of the vehicle, to ask the occupants why they had been on the school grounds, and to run a license check on the driver, Huertas. Id. Thereafter, upon learning that Huertas' license __ had been suspended, the police properly arrested Huertas. Id. __ The district court found that the police officers then asked Kimball and Brochu, in a nonthreatening and noncoercive manner, if they would agree to come to the station to answer some questions, and that they voluntarily consented to do so. Id. __ The "Terry stop" therefore ended when Kimball and Brochu agreed _____ to go with the police officers to the station. Id. __ Kimball challenges the district court's findings, arguing that he was effectively seized after Deputy Word stopped Huertas' vehicle, prior to the officer's request that he go to the station for further questioning, and that he did not ____________________ testimony, on one occasion, in response to repeated questions at the suppression hearing as to why he stopped Huertas' vehicle. Kimball ignores substantial other testimony by Deputy Word which makes it clear that Deputy Word stopped Huertas' vehicle because he believed it was suspicious, based on the fact that the vehicle should not have been in the school parking lot at that late hour, and there had been a recent rash of school burglaries. -12- voluntarily consent to go with the officers. Kimball contends that the "Terry stop" did not end until his arrest several hours _____ later, and the stop was thus unreasonable in duration. The question of whether a defendant has consented to questioning by the police, and whether that consent was given voluntarily, are questions of fact to be determined from the totality of all of the circumstances. Schneckloth v. Bustamonte, ___________ __________ 412 U.S. 218, 227 (1973); United States v. Miller, 589 F.2d _____________ ______ 1117, 1130 (1st Cir. 1978), cert. denied, 440 U.S. 958 (1979); ____________ United States v. Analla, 975 F.2d 119, 125 (4th Cir. 1992), cert. _____________ ______ _____ denied, 113 S. Ct. 1853 (1993). The record supports the ______ conclusion that Kimball voluntarily consented to undergo further questioning. The testimony of Deputy Weymouth demonstrates that the deputies asked Kimball several times whether he would come down to the station and talk with officers, and each time Kimball expressly agreed to do so. This was not an unusual request by the officers; rather, it was department policy not to engage in detailed interviews on the side of the road. See, e.g., Florida ___ ___ _______ v. Royer, 460 U.S. 491, 504-05 (1983) ("there are undoubtedly _____ reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention . . . "). There is no evidence that Kimball ever indicated that he was unwilling to accompany the police officers to the station. Moreover, there is no evidence that any of the officers coerced or intimidated Kimball into going with them. Although Kimball was not expressly told that he was free to leave -13- the scene, or free to refuse to undergo further questioning, and this fact cuts against a finding of voluntariness in the overall calculus, the Government was not required to demonstrate such knowledge by Kimball as a prerequisite to establishing voluntary consent. Schneckloth, 412 U.S. at 249. ___________ The record also indicates that both the officers and Kimball acted in a manner that was at all times consistent with Kimball having voluntarily consented to their request. The officers did not handcuff or physically restrain Kimball. The officers did not threaten to arrest Kimball. The officers did not take any identification or personal effects from Kimball. Additionally, when Kimball was transported to the station, he rode in the front seat of Deputy Word's patrol car, and apparently engaged in relaxed conversation that was unrelated to the case. Once Kimball arrived at the station, the police officers permitted Kimball to move freely around the station. As a general matter, we would be cautious in finding that a defendant voluntarily consented to undergo further questioning when, after being stopped by one police officer, five other officers converge on the scene soon thereafter to investigate. Additionally, Kimball, like any reasonable defendant, may have been intimidated by the fact that the driver of the vehicle, Huertas, was then arrested for driving with a suspended license, and taken to the police station. We believe that here, however, our general fears are outweighed by the specifics of the situation, which point to the conclusion that -14- Kimball did in fact agree to go to the station. After examining the record, we are left with the impression that Kimball did initially consent voluntarily to further questioning. Upon learning that further questioning at the station produced incriminating statements from his codefendants, however, Kimball now wants to challenge the voluntariness of his consent in an attempt to taint the police officers' conduct in stopping and questioning all three occupants of the vehicle. The nature of Kimball's consent obviously does not hinge upon whether his strategic decision to acquiesce to the police officer's request was effective. We do not believe that the district court's finding that Kimball's consent to further questioning was voluntary, is clearly erroneous. See, e.g., Karas, 950 F.2d at 35; United ___ ____ _____ ______ States v. Manchester, 711 F.2d 458, 462 (1st Cir. 1983); Miller, ______ __________ ______ 589 F.2d at 1130. We therefore conclude that the "Terry stop" _____ was reasonable at its inception and in its duration, given that the stop ended when Kimball agreed to go to the station, and that the stop did not in any way violate Kimball's Fourth Amendment rights. C. Standing to Challenge the Inventory Search? C. Standing to Challenge the Inventory Search? While we have found that Kimball does have standing to challenge the stop and consequently the seizure of the tools as a fruit of that stop, Kimball could separately challenge the constitutionality of the inventory search itself, through which the police officers seized the tools. Standing to challenge a -15- search presents issues separate and distinct from standing to challenge the stop. Erwin, 875 F.2d at 269. Kimball in fact, _____ does additionally argue that the police officer's decision to impound Huertas' vehicle, and the ensuing inventory search, was a mere subterfuge to perform an unconstitutional investigatory search. We believe that Kimball lacks standing to object to either the seizure of the car or the subsequent inventory search.6 In order to embark on a suppression challenge, a "defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the item seized." United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988) ______________ _______ (citing United States v. Salvucci, 448 U.S. 83, 90-92 (1980)); _____________ ________ see also United States v. Mancini, 8 F.3d 104, 107 (1st Cir. _________ _____________ _______ 1993). "[T]he defendant must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." Mancini, 8 F.3d at 107 (citations _______ omitted). The burden of proving this expectation lies with the defendant. Mancini, 8 F.3d at 107. _______ The record is bereft of evidence that Kimball maintained a subjective expectation of privacy in the vehicle apparently owned and operated by Huertas. The record also fails to disclose any facts which show that Kimball had an objectively reasonable expectation of privacy in his friend's vehicle. Thus, ____________________ 6 While the district court concluded that the police officers lawfully performed the inventory search and seized the tools found in the vehicle, we do not reach this issue. -16- Kimball has failed to proffer any evidence establishing any privacy expectation in the area searched. Kimball instead bases his claim for standing solely on the fact that he claimed a possessory interest in the items seized during the inventory search. This contention, in itself, however, is insufficient to confer standing. Ownership alone is not enough to establish a reasonable and legitimate expectation of privacy. Ownership is relevant to the inquiry . . . but the total circumstances determine whether the one challenging the search has a reasonable and legitimate expectation of privacy in the locus of the search. United States v. Dall, 608 F.2d 910, 914 (1st Cir. 1979), cert. ______________ ____ _____ denied, 445 U.S. 918 (1980) (citations omitted); see also ______ _________ Salvucci, 448 U.S. at 92 ("we must ... 'engage in a conscientious ________ effort to apply the Fourth Amendment' by asking not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched.") (quoting Rakas, 439 U.S. at 147-49). Certainly the _____ fact that Kimball owned the tools was a factor working in his favor in the standing determination.7 Without any evidence that Kimball left the tools in a place that could justifiably give rise to an expectation of privacy, however, he simply has not ____________________ 7 The tools were apparently in an opened black bag in the back seat of Huertas' vehicle. While a "bag may be used as a repository of personal possessions," the mere possibility of such personal use does not lead us to "the conclusion that such contents are 'inevitably' associated with an expectation of privacy." United States v. Goshorn, 628 F.2d 697, 700 (1st Cir. _____________ _______ 1980). Kimball failed to introduce any evidence that he had an expectation of privacy in the bag. -17- sustained his burden of demonstrating that his own Fourth Amendment rights were affected by the inventory search of the vehicle. See, e.g., Aguirre, 839 F.2d at 857. ___ ____ _______ D. Statements Made By Huertas and Brochu D. Statements Made By Huertas and Brochu As a final matter, Kimball contends that the confessions made by Brochu and Huertas were "fruit of the poisonous tree" from the allegedly unconstitutional stop of Huertas' vehicle, and the statements must therefore be suppressed. The short answer to this contention is that we have found nothing unreasonable about the stop of Huertas' vehicle, and therefore, there is nothing constitutionally infirm with admitting these statements. For the foregoing reasons, the decision of the district court is affirmed. ________ -18-