FILED
United States Court of Appeals
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**March 13, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

ANA MUNOZ; MICHAEL TILLEY, on
behalf of themselves and all others
similarly situated,

    Plaintiffs - Appellees,

v.

CONDUENT STATE & LOCAL
SOLUTIONS, INC.; CONDUENT
BUSINESS SERVICES, LLC.,

    Defendants - Appellants,

and

WELLS FARGO BANK N.A.,

    Defendant.

No. 24-2044
(D.C. No. 1:23-CV-00202-LF-SCY)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BACHARACH**, and **FEDERICO**, Circuit Judges.
_____

The State of New Mexico contracted with Wells Fargo Bank, N.A. ("Wells

Fargo") to run "EPPICard," a program that delivers state benefits to qualified

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

recipients via a prepaid debit card.  Wells Fargo subcontracted with Conduent State & Local Solutions, Inc. and Conduent Business Services, LLC (collectively "Conduent") to administer the EPPICard program.

Cardholders Ana Munoz and Michael Tilley[1] sued Wells Fargo and Conduent for violations of federal and state law for failure to reimburse them for unauthorized transactions on their EPPICards.  Each defendant moved to compel arbitration based on an arbitration agreement contained in the EPPICard Terms and Conditions.  The district court granted Wells Fargo's motion but denied Conduent's.

Conduent appeals the denial of its motion to compel.  It argues the district court erred by (1) deciding whether the claims were arbitrable rather than delegating that decision to the arbitrator, and (2) denying that equitable estoppel should compel arbitration of the claims.  Exercising jurisdiction under 9 U.S.C. § 16(a), we reverse on the second ground.

## I. BACKGROUND

### A. *Factual Background*[2]

### 1. EPPICard Program

The State of New Mexico paid unemployment benefits, child support payments, and social support funds through prepaid EPPICard accounts.  The State

---

[1] We refer to the Plaintiffs as "Ms. Munoz and Mr. Tilley" or "the Cardholders."

[2] We take these facts from the first amended complaint.  When reviewing a motion to compel arbitration, courts accept as true the operative complaint's factual

contracted with Wells Fargo to run the EPPICard program. Wells Fargo

subcontracted with Conduent "to fulfill nearly every aspect of Wells Fargo's

obligations to the State of New Mexico." App. at 82.

As program manager, "Conduent control[led] central and basic aspects of the

EPPICard, including all consumer-facing functions." *Id.* at 88. Conduent was

responsible for sending a "Welcome Kit" containing the EPPICard to new

cardholders. *Id.* at 87. It also was responsible for "handl[ing] all customer service

issues relating to EPPICards," including "disputes and complaints concerning fraud

or unauthorized use." *Id.* at 88.

When New Mexico identified an eligible benefits recipient, it would send the

recipient's contact information to Conduent, which would open an account and

deliver a Welcome Kit to the recipient. The Welcome Kit contained an introductory

letter, the physical EPPICard, and the EPPICard Terms and Conditions ("Terms").

2. **EPPICard Terms**

a. *Party identification and definitions*

The first paragraph of the EPPICard Terms identified Wells Fargo,

Cardholder, and Conduent as follows:

> The Card is issued to you by Wells Fargo Bank, N.A. (also
> referred to in these Terms as "Bank," "we," or "us") on behalf
> of the State of New Mexico . . . . In these Terms, the words
> "cardholder," "you," and "your" refer to the person to whom

---

allegations. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012);
*Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 233 (4th Cir. 2019);
*Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115, 1118 (9th Cir. 2011).

the Card is issued or made available. The program manager for the Card is Conduent State & Local Solutions, Inc.

*Id.* at 167. For the remainder of the Terms, Wells Fargo and Conduent were not mentioned by name. Only the terms "Bank," "we," and "us" were used. *Id.*

b. *Arbitration Agreement*

The Terms contained an arbitration provision (the "Arbitration Agreement"), committing the Cardholders' disputes with "Bank" to arbitration:

> **20. DISPUTE RESOLUTION PROGRAM: ARBITRATION AGREEMENT.**
>
> **(a) Binding Arbitration.** If you have a dispute with Bank, and you are not able to resolve the dispute informally, you and Bank agree that upon demand by either you or Bank, the dispute will be resolved by the arbitration process set forth in this Section. . . .
>
> **(b) Disputes.** A dispute is any unresolved disagreement between you and Bank. It includes any dispute relating in any way to the Card or related services or matters described in these Terms[.] . . . It includes claims based on broken promises or contracts, torts, or other wrongful actions. It also includes statutory, common law, and equitable claims.

*Id.* The final clause of Subsection (b)—the "delegation clause"—further provided:

> A dispute also includes any disagreement about the meaning, application or enforceability of this Arbitration Agreement.

*Id.*

c. *Governing law and consent*

The Terms stated they were governed by federal law and, "to the extent applicable, the laws of the state of South Dakota." *Id.* The Terms also said the Cardholder's activation and use of the EPPICard constituted consent to the Terms.

### 3. **Allegations**

Conduent issued EPPICards to Ms. Munoz and Mr. Tilley. Later, they both discovered large unauthorized transactions had depleted their EPPICard accounts.[3]

Ms. Munoz and Mr. Tilley reported the unauthorized transfers to Conduent. Conduent denied their reimbursement requests, stating "we cannot confirm that fraud occurred. Our investigation indicates that you entered into an agreement with the merchant." *Id.* at 90, 92. The Cardholders alleged there was "no basis to assert" they had authorized the transactions with a merchant. *Id.* Even so, they were not refunded or issued a credit for the money stolen from their accounts.

### B. *Legal Background*

To aid in understanding the district court proceedings, we provide a brief overview of the applicable law.

### 1. **Federal Arbitration Act**

The Federal Arbitration Act ("FAA") provides that a party "aggrieved" by another party's failure to "arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4; *see also id.* § 2. The court "shall" order arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." *Id.* § 4.

---

[3] Mr. Tilley alleges many of the unauthorized transactions on his account "were obviously fraudulent, many of them apparently involving an Estonian cryptocurrency exchange." App. at 91.

2. **Motions to Compel Arbitration**

A motion to compel arbitration typically raises whether (1) the parties formed an agreement to arbitrate, and (2) the dispute is "arbitrable." *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296-99 (2010).

The first question is a matter of judicial determination and generally may not be delegated to an arbitrator. *See* 9 U.S.C. § 4 (stating the court must be "satisfied that the making of the agreement for arbitration . . . is not in issue" before compelling arbitration); *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1106-07 (10th Cir. 2020) (stating formation challenges "cannot be delegated to an arbitrator"); *see AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 648-49 (1986) (explaining that "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration").

The second question—the arbitrability of a dispute—concerns "whether parties have agreed to 'submi[t] a particular dispute to arbitration.'" *Granite Rock*, 561 U.S. at 296 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). The court decides arbitrability, *id.*, unless the parties have "clearly and unmistakably" delegated such issues to the arbitrator via a delegation clause. *AT&T Techs.*, 475 U.S. at 649.

3. **Equitable Estoppel**

A court may compel a plaintiff that is a party to an arbitration agreement to arbitrate disputes with a defendant that is not. *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) (granting a motion to compel

under the doctrine of equitable estoppel, though the plaintiffs "contend[ed] [] that they [were] *not* required to arbitrate with Defendants, because they [were] *not* parties to the [arbitration] agreement"). State law equitable estoppel doctrine may allow a nonparty (or "nonsignatory") to an arbitration agreement to enforce that agreement against a plaintiff. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-32 (2009); *see GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 438 (2020) ("[T]he FAA permits a nonsignatory to rely on state-law equitable estoppel doctrines to enforce an arbitration agreement.").[4]

Many state courts, including the South Dakota Supreme Court, have held that a nonsignatory defendant may compel arbitration against a signatory plaintiff when (1) the plaintiff alleged "substantially interdependent and concerted misconduct" between the nonsignatory and a signatory to the arbitration agreement, or (2) the plaintiff asserts "claims arising out of agreements against nonsignatories to those agreements without allowing those defendants also to invoke the arbitration clause

---

[4] Ms. Munoz and Mr. Tilley argue the Supreme Court in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), overruled *Arthur Andersen*. In *Morgan*, the Court held that federal courts must not create "custom-made rules" favoring arbitration. *Id.* at 419. Cardholders argue that applying South Dakota's "unique rule of equitable estoppel" to arbitration agreements "is precisely the kind of arbitration-specific rule *Morgan* held the FAA prohibits." Aplee. Br. at 30.

In *Morgan*, however, the Supreme Court held only that federal courts may not fashion procedural rules favoring arbitration, *Morgan*, 596 U.S. at 418-19, which does not disturb *Arthur Andersen*'s holding that state contract law principles, including equitable doctrines, apply to arbitration agreements. The district court held *Morgan* inapplicable and applied South Dakota's equitable estoppel doctrine. We agree.

contained in the agreements." *Rossi Fine Jewelers, Inc. v. Gunderson*, 648 N.W.2d 812, 815 (S.D. 2002) (brackets and quotations omitted).

## C. *Procedural History*

### 1. **Amended Complaint**

Ms. Munoz and Mr. Tilley filed a putative class action against Wells Fargo and Conduent for violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, et seq., and the New Mexico Unfair Practices Act ("UPA"), N.M. Stat. Ann. § 57-12-1, et seq.

They alleged Wells Fargo and Conduent violated the EFTA by (1) failing to investigate fraud claims in good faith, (2) improperly denying fraud claims, and (3) improperly placing the burden on the consumer to prove the disputed transactions were unauthorized. They further alleged that Defendants violated the UPA by misrepresenting "consumer liability for unauthorized transfers and the burden imposed on consumers in disputing such transactions." App. at 99-100. Their claims expressly relied only on the EFTA and UPA and not breach of contract under the Terms.[5]

### 2. **Motions to Compel Arbitration**

Wells Fargo and Conduent each moved to compel arbitration of the claims under the FAA. They contended that, because the Terms contained an arbitration

---

[5] The amended complaint did not append the Terms. It did, however, reference statements from the Welcome Kit letter and the Terms to describe Wells Fargo's and Conduent's roles in the EPPICard program.

agreement and a delegation clause, the arbitrator was required to determine whether the claims were arbitrable.

Ms. Munoz and Mr. Tilley then filed their first amended complaint—the operative complaint here. Shortly thereafter, they agreed to submit their dispute with Wells Fargo to arbitration, but not with Conduent.

Conduent filed a renewed motion to compel arbitration. It argued the court should refer to the arbitrator the question of whether the claims against it were arbitrable. Alternatively, it contended that the court should compel arbitration under South Dakota's equitable estoppel doctrine, either because the complaint (1) alleged "substantially interdependent and concerted misconduct" of Conduent and Wells Fargo, *id.* at 127-29, or (2) relied on the Terms for its factual allegations.[6]

The Cardholders opposed Conduent's renewed motion, arguing "the question of whether an arbitration agreement exists between [the Cardholders] and Conduent must be decided by the Court in the first instance." *Id.* at 198. They argued against equitable estoppel because their claims were "based on obligations imposed on [Conduent] by federal and state law, not on the Terms." *Id.* at 197.

---

[6] Conduent said the following factual allegations relied on the Terms: "(1) Defendants issue the EPPICard; (2) the EPPICard is a prepaid Visa debit card linked to a subaccount held by Defendants; (3) the EPPICard Accounts are 'accounts' as that term is defined by 15 U.S.C. § 1693a; (4) the Conduent Defendants send the EPPICard to the consumer when the account is created; (5) the Conduent Defendants send periodic statements of account to consumers; and (6) Plaintiffs contacted 'EPPICard' to report the allegedly unauthorized electronic fund transfers." App. at 129.

3.  **District Court Order**

The district court granted Wells Fargo's motion to compel but denied Conduent's.  The following describes the latter ruling.

a.  *Formation*

First, the district court said, "[t]he issue of whether an arbitration agreement was formed [between Conduent and the Cardholders] is decided by the Court," *id.* at 224, because "[c]ourts must always resolve whether the [arbitration] clause was agreed to by the parties," *id.* (quotations omitted) (brackets in original); *see also id.* at 227 ("While the arbitrator can decide all disputes, including enforceability, the Court, not the arbitrator, must decide whether there is an agreement to arbitrate in the first instance.").

Second, the district court determined Conduent and the Cardholders did not agree to arbitrate.  The court explained that, although "[t]he Terms provide a clear agreement between the cardholders (plaintiffs) and the Bank (Wells Fargo) to arbitrate claims with the Bank," *id.* at 226-27, "[t]here is no evidence of mutual assent between plaintiffs and Conduent with regard to arbitrating their disputes," *id.* at 227.  The court noted the delegation clause did not affect this analysis because it "does not govern whether an arbitration agreement was formed, but only arbitrability once the arbitration agreement is formed."  *Id.* at 228.

b.  *Equitable estoppel*

The district court next concluded Conduent could not compel arbitration under South Dakota's equitable estoppel doctrine.

10

First, the district court considered whether there was substantially interdependent and concerted misconduct alleged between Conduent and Wells Fargo. It explained that South Dakota has not "precisely define[d] 'concerted misconduct,' leaving courts without a clear standard as to when a plaintiff's claims qualify as alleging 'interdependent' and 'concerted' misconduct under South Dakota law." *Id.* at 231. Looking to "district court decisions interpreting the law" of South Dakota, the district court found persuasive *Estrada v. The Moore Law Group*, No. 22-CV-1594, 2022 WL 2666924 (C.D. Cal. July 11, 2022) (unpublished). *Estrada* interpreted South Dakota's concerted-misconduct test as requiring the plaintiff to specifically allege that the signatory and nonsignatory "knowingly acted in concert, improperly cooperated, or worked hand-in-hand" in the alleged misconduct. *Id.* at *3 (quotations omitted).

Applying *Estrada*, the district court concluded that the amended complaint did not contain such allegations. It stated that, although the "plaintiffs allege[d] that Wells Fargo's and Conduent's behavior was the same with regard to the alleged unauthorized debits, they do not allege that Wells Fargo and Conduent conspired or worked together in failing to remedy the alleged unauthorized transactions on plaintiffs' EPPICards." App. at 233.

Second, the district court considered whether the Cardholders asserted claims "arising out of the Terms." *Id.* at 234. The court said they had not because "plaintiffs' claims arise from alleged violations of EFTA and the UPA," not the EPPICard Terms. *Id.*

11

The district court thus denied Conduent's motion to compel arbitration. Conduent timely appealed.

## II. **DISCUSSION**

Conduent argues the district court erred by (A) deciding whether the claims were arbitrable rather than delegating that decision to the arbitrator, and (B) denying that equitable estoppel should compel arbitration of the claims.

### A. *Arbitrability*

"We review de novo a district court's decision to grant or deny a motion to compel arbitration." *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 832 (10th Cir. 2023).

### 1. **Legal Background**

Conduent's motion to compel arbitration raised (1) whether Conduent and the Cardholders agreed to arbitrate their disputes and (2) whether the Cardholders' claims against Conduent are arbitrable under the arbitration agreement. *See Soc'y of Pro. Eng'g Emps. in Aerospace v. Spirit Aerosystems, Inc.*, 681 F. App'x 717, 721 (10th Cir. 2017) (unpublished) (citing *Granite Rock*, 561 U.S. at 299).[7]

The first question—whether parties agreed to arbitrate—"must always be decided by a court." *Fedor*, 976 F.3d at 1105 (citation omitted); *see Brayman*, 83 F.4th at 832; *see also* 9 U.S.C. § 4. In making this determination, courts generally

---

[7] We cite unpublished opinions for their persuasive value under Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

apply ordinary principles governing contract formation. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Morgan*, 596 U.S. at 418 ("[A]rbitration agreements [are] as enforceable as other contracts, but not more so.").

The second question—a dispute's "arbitrability"—depends on the parties' agreement. Unless the agreement provides otherwise, courts resolve threshold arbitrability questions "such as the validity, scope, or enforcement of an arbitration contract," *Fedor*, 976 F.3d at 1105, but the parties may choose to "commit the determination of such issues to an arbitrator" via a delegation clause in the arbitration agreement. *Id.* The Supreme Court has stated, however, that before enforcing a delegation clause, courts must find "clea[r] and unmistakabl[e] evidence" that the parties consented to arbitrate arbitrability questions. *First Options*, 514 U.S. at 944 (quoting *AT&T Techs.*, 475 U.S. at 649); *Brayman*, 83 F.4th at 832.

In sum, once a court is satisfied that (1) the parties formed an arbitration agreement (2) containing clear and unmistakable evidence that the parties also agreed to arbitrate arbitrability, questions about the validity or scope of the arbitration contract—for example, whether the Cardholders' claims against Conduent are subject to arbitration—are for the arbitrator and not the court to decide.[8]

---

[8] The Supreme Court has held that delegation clauses are severable from the rest of an arbitration agreement. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70-71 (2010). "Therefore, if a party challenges the validity of an arbitration contract as a whole but fails to specifically challenge a delegation clause therein, then the delegation clause will typically require a court to compel arbitration and allow the arbitrator to determine whether the arbitration contract was indeed valid." *Fedor*, 976 F.3d at 1105; *see Rent-A-Center*, 561 U.S. at 71-73. This situation does not

### 2. Conduent's Arguments

Conduent argues the district court erred by considering whether Conduent and the Cardholders agreed to arbitrate. It contends the Cardholders agreed to Terms that were binding on all parties, including the Arbitration Agreement. Thus, whether Conduent was included in the Arbitration Agreement was not a question of formation but of the Agreement's scope—what disputes it covered. Aplt. Br. at 28-31. And because the Cardholders did not specifically challenge the delegation clause, this scope question was for the arbitrator—not the court—to decide. *Id.* at 30-33.[9] Alternatively, Conduent maintains, "[e]ven if the district court properly reached the arbitrability of [the Cardholders'] claims against Conduent, . . . [the] claims against Conduent fall within the scope of the Arbitration Agreement." *Id.* at 45.

### 3. The Cardholders' Arguments

The Cardholders argue the district court must decide whether an arbitration agreement exists between them and Conduent. Aplee. Br. at 18. Although the

---

apply, however, when the party challenges the arbitration contract on the ground that no contract was formed, *Fedor*, 976 F.3d at 1105, as formation challenges "must be heard by a court instead of an arbitrator," *id.* at 1106.

[9] Conduent also asserts that, under the delegation clause, the arbitrator must decide whether Conduent could compel arbitration based on equitable estoppel. *See* Aplt. Br. at 35; *see also* Aplt. Reply Br. at 15; Oral Arg. at 14:00-14:33. We disagree. Equitable estoppel permits a nonsignatory to an arbitration agreement to compel arbitration against a signatory, which presupposes the parties did not form an agreement to arbitrate. Absent an agreement, even one containing a delegation clause, a nonsignatory must look to the court to compel arbitration based on equitable principles. *See Fedor*, 976 F.3d at 1105 ("[A] delegation clause cannot be severed from an agreement that does not exist.").

14

Cardholders agree that the Terms generally were binding on all parties, they contend the Arbitration Agreement "expressly excluded" Conduent by "limit[ing] arbitration to disputes between Plaintiffs and 'Bank'—a term defined as Wells Fargo." *Id.* at 13. The Cardholders therefore assert they never agreed to arbitrate with Conduent. *Id.* at 14.

4.  **Application**

It was proper for the district court to decide whether Conduent and the Cardholders agreed to arbitrate their disputes. As the FAA and this court have made clear, "The issue of whether an arbitration agreement was formed between the parties must always be decided by a court, regardless of whether the alleged agreement contained a delegation clause or whether one of the parties specifically challenged such a clause." *Fedor*, 976 F.3d at 1105; 9 U.S.C. § 4.

Conduent's argument that the district court acted improperly because the issue concerned only the scope of the Arbitration Agreement rather than its formation lacks merit. The Cardholders' agreement to arbitrate with Wells Fargo does not determine whether they consented to arbitrate with Conduent. *Fedor*, 976 F.3d at 1106 ("[C]ourts must 'always' resolve 'whether the [arbitration agreement] was agreed to' by the parties." (quoting *Granite Rock*, 561 U.S. at 297, 299)). Nor does the delegation clause resolve this issue because delegation clauses apply only when the court has determined an agreement was formed. *Id.*

Although it was proper for the district court to decide whether Conduent and the Cardholders agreed to arbitrate, we do not need to address whether it correctly

15

concluded they did not. Assuming without deciding they did not agree, we nonetheless conclude that Conduent's motion to compel arbitration should have been granted on equitable estoppel grounds.[10]

## B. *Equitable Estoppel*

### 1. **South Dakota Equitable Estoppel Law**

Under South Dakota law, equitable estoppel to compel arbitration applies in either of two circumstances.

First, a nonsignatory defendant may compel a signatory plaintiff to arbitrate based on equitable estoppel when "all the claims against the nonsignatory defendants are based on alleged substantially interdependent and concerted misconduct by both the nonsignatories and one or more of the signatories to the contract." *Rossi*, 648 N.W.2d at 815 (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)).

Second, equitable estoppel applies if a signatory plaintiff "assert[s] claims arising out of agreements against nonsignator[y] [defendants] to those agreements without allowing those [defendants] [also to] invoke the arbitration clause contained in the agreements." *Id.* (quotations omitted); *see Lenox MacLaren Surgical Corp. v.*

---

[10] This court, in an unpublished opinion, similarly assumed without deciding there was no agreement to arbitrate, proceeded to address equitable estoppel, and reversed the district court's denial of motion to compel that was based on equitable estoppel. *Ferrell v. Cypress Env't Mgmt.-TIR, LLC*, Nos. 20-5092, 20-5093, 2021 WL 5576677, at *2-3 (10th Cir. Nov. 30, 2021) (unpublished).

*Medtronic, Inc.*, 449 F. App'x 704, 708 (10th Cir. 2011) (applying Colorado law) (unpublished).

Each of these bases for equitable estoppel is independently sufficient to compel arbitration. *See Rossi*, 648 N.W.2d at 815-16 (citing *MS Dealer*, 177 F.3d at 947); *see MS Dealer*, 177 F.3d at 947 (stating "equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances"). We address only the first one—alleged substantially interdependent and concerted misconduct.

2. **Choice of Concerted-Misconduct Approach**

Since the *Rossi* decision in 2002, South Dakota courts have not further defined concerted misconduct for equitable estoppel. Other courts have developed different approaches. Our task is to determine which one the South Dakota Supreme Court would apply. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007). In doing so, we may "seek guidance from . . . appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and 'the general weight and trend of authority' in the relevant area of law." *Id.* (citations omitted).

We "review *de novo* a district court's determination of state law." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991); *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 727 (10th Cir. 1991) ("In exercising *de novo* review we afford no deference to the district court's interpretation of state law."). We therefore review de novo the district court's prediction of the concerted-misconduct equitable estoppel approach that South Dakota courts would likely apply.

17

a.  Estrada

The district court in this case applied a narrow concerted-misconduct approach from *Estrada*, a California federal district court decision predicting what approach the South Dakota Supreme Court would apply.  The *Estrada* court took guidance from *Donaldson Co., Inc. v. Burroughs Diesel, Inc.*, 581 F.3d 726 (8th Cir. 2009). *See Estrada*, 2022 WL 2666924, at *3.[11]  In *Donaldson*, the Eighth Circuit interpreted Mississippi equitable estoppel law.  It said the plaintiff must "specifically allege coordinated behavior between [] signatory and [] nonsignatory [defendants]" to show interdependent and concerted misconduct, *Donaldson*, 581 F.3d at 734, including that defendants "knowingly acted in concert," "improperly cooperated," or "worked hand-in-hand." *Id.  Estrada* added that conspiracy allegations also suffice. *See Estrada*, 2022 WL 2666924, at *3.

b.  *Majority approach*

*Estrada* represents a minority position.  Courts in most jurisdictions, including this court, have not interpreted concerted misconduct as limited to specific allegations of coordinated behavior or conspiracy.  They instead have considered broader allegations of interdependence involving signatories and nonsignatories. This approach emphasizes practical "considerations of fairness." *Ferrell*, 2021 WL 5576677, at *4.

---

[11] In addition to *Estrada*, one other federal district court has also applied *Donaldson*'s approach to South Dakota law.  *See Pacanowski v. Alltran Fin., LP*, 271 F. Supp. 3d 738, 748 (M.D. Pa. 2017).

18

For example, in *Reeves v. Enterprise Products Partners, LP*, 17 F.4th 1008 (10th Cir. 2021), this court applied the majority approach under Oklahoma concerted misconduct equitable estoppel law.  In *Reeves*, the plaintiffs worked for a company through staffing agencies.  *Id.* at 1010.  They signed employment contracts containing arbitration agreements with the staffing agencies, but not the company.  *Id.*  Plaintiffs then sued the company for unpaid overtime wages under the Fair Labor Standards Act but did not sue the staffing agencies.  *Id.*

Although the complaint did not specifically allege coordinated action or conspiracy between the company and staffing agencies—indeed, it did not even mention the staffing agencies—this court compelled the plaintiffs to arbitrate their disputes with the nonsignatory company based on their arbitration agreement with the staffing agencies.  We explained, "While [plaintiffs] may have carefully left out any claims against [the staffing agencies] in [their] pleading," the "litigation will surely involve facts regarding the role [the staffing agencies] had in [plaintiffs'] employment with [the company] and the ensuing dispute."  *Id.* at 1014.  Because the plaintiffs had agreed to arbitrate employment disputes with the staffing agencies and their claims against the company were "inherently inseparable and integrally related" to their relationship with the staffing agencies, we applied equitable estoppel to compel arbitration.  *Id.* (quotations omitted).[12]

---

[12] In *Ferrell*, we compelled arbitration in a case "almost identical" to *Reeves*, except the staffing agency had intervened in the lawsuit.  *Ferrell*, 2021 WL 5576677, at *3.  We noted that the case for equitable estoppel based on interdependent and

In *Reeves*, this court thus recognized interdependent and concerted misconduct based on allegations that likely would fall outside the narrow *Estrada* approach. Examples from other courts following the majority approach include *Machado v. System4 LLC*, 28 N.E.3d 401 (Mass. 2015), in which the Massachusetts Supreme Court found concerted misconduct because the plaintiffs "consistently charged both [defendants] with equal wrongs, failing to distinguish them," and alleged no claim against either defendant "as a separate entity." *Id.* at 412-13. The court noted that "[s]ome jurisdictions require allegations of 'pre-arranged, collusive behavior,'" but it did not require such allegations to compel arbitration based on equitable estoppel. *Id.* at 412 n.17 (quoting *Donaldson*, 581 F.3d at 734-35).

Similarly, in *LeBlanc v. Texas Brine Co., LLC*, No. 12-2059, 2016 WL 2849506 (E.D. La. May 10, 2016) (unpublished), a district court applying Louisiana equitable estoppel law rejected the argument that concerted misconduct requires specific conspiracy allegations. *Id.* at *7-8 ("Neither federal law nor Louisiana law requires allegations of civil conspiracy or express use of the terms 'concerted' or 'interdependent.'"). Although the plaintiff had "carefully pleaded its claims" separately against the defendants, the court found concerted misconduct based on the "nearly identical claims" against them. *Id.* at *8. The court also noted it "need not

---

concerted misconduct was "even clearer than it was in *Reeves*" because the signatory was a party to the suit. *Id.* at *4.

ignore" other allegations supporting interdependence, such as whether the signatory

defendant had "delegated certain of its duties" to the nonsignatory defendant. *Id.*

The clear trend of state authority supports the majority approach. In general,

state courts have not adopted the narrow *Estrada* approach. Like *Reeves*, state courts

instead evaluate a broader range of allegations to determine whether the plaintiff

alleged interdependent claims against signatory and nonsignatory defendants that

would otherwise be arbitrable under the agreement.[13]

---

[13] *See S. Energy Homes, Inc. v. Kennedy*, 774 So. 2d 540, 545 (Ala. 2000); *Zografos v. Wehbe*, No. A-1580-15T1, 2017 WL 4104868, at *5 (N.J. Super Ct. App. Div. Sept. 18, 2017) (applying Delaware law); *Maldonado v. Mattress Firm, Inc.*, No. 13-CV-292, 2013 WL 2407086, at *5 (M.D. Fla. June 3, 2013); *Luke v. Gentry Realty, Ltd.*, 96 P.3d 261, 268 (Haw. 2004); *Hemphill v. Ford Motor Co.*, 206 P.3d 1, 9-10 (Kan. Ct. App. 2009); *Household Fin. Corp. II v. King*, No. 2009-CA-1472, 2010 WL 3928070, at *4 (Ky. Ct. App. Oct. 8, 2010); *Pontchartrain Nat. Gas Sys. v. Tex. Brine Co.*, 317 So. 3d 715, 743-44 (La. Ct. App. 2020); *Machado*, 28 N.E.3d at 411-13; *City of Detroit Police & Fire Ret. Sys. v. GSC CDO Fund Ltd.*, No. 289185, 2010 WL 1875758, at *7 (Mich. Ct. App. May 11, 2010); *Melendez v. Horning*, 908 N.W.2d 115, 120 (N.D. 2018); *Eric Petrol. Corp. v. Ascent Res.-Utica LLC*, No. 23 CO 0055, 2024 WL 4511642, at *13 (Ohio Ct. App. Oct. 7, 2024); *Cinocca v. Orcrist, Inc.*, 60 P.3d 1072, 1074-75 (Okla. Civ. App. 2002); *Pearson v. Hilton Head Hosp.*, 733 S.E.2d 597, 605 (S.C. Ct. App. 2012); *Skyleasing, LLC v. Tejas Avco Inc.*, No. 14-05-212-CV, 2006 WL 2290852, at *5-6 (Tex. Ct. App. Aug. 10, 2006) (noting that "Texas courts have not applied a uniform standard," but denying equitable estoppel because claims were not "based upon the same operative facts and [were not] inherently inseparable"); *Decisive Analytics Corp. v. Chikar*, No. CL 2008-6171, 2008 WL 6759965, at *8 (Va. Cir. Ct. July 15, 2008); *Noye v. Johnson & Johnson Servs., Inc.*, 765 F. App'x 742, 747-48 (3d Cir. 2019) (applying Pennsylvania and Michigan law); *Aggarao v. MOL Ship Mgmt., Co.*, 675 F.3d 355, 373-75 (4th Cir. 2012); *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398-99 (5th Cir. 2006) (applying Louisiana law). These states apply the same two-part equitable estoppel test as South Dakota, under which each part—(1) interdependent and concerted misconduct, or (2) claims arising out of the agreement—may be independently sufficient to compel arbitration.

\*    \*    \*    \*

Based on the foregoing, we predict the South Dakota Supreme Court would not limit the concerted-misconduct equitable estoppel doctrine to allegations of conspiracy or coordinated behavior. It would instead consider a broader range of allegations to establish interdependence, as most jurisdictions have done, and as this court did in *Reeves*. The district court therefore erred in applying *Estrada* when it rejected Conduent's equitable estoppel argument. We next apply the majority approach to decide whether the Cardholders should be compelled to arbitrate their claims against Conduent based on equitable estoppel.

3. **Application of Majority Approach**

Because the district court applied an incorrect concerted-misconduct standard, we owe no deference to its equitable estoppel determination. *United States v. Singer Mfg. Co.*, 374 U.S. 174, 194 n.9 (1963) (holding when a court applies "an improper standard to the facts, it may be corrected as a matter of law"); *see Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 460 (4th Cir. 1996) ("[W]e owe no deference to the district court's findings if they are derived as a result of the court's misapplication of the law."); *United States v. Kimball*, 25 F.3d 1, 6 (1st Cir. 1994) ("If the district court applies the wrong legal standard, . . . no deference attaches to such an application."). Applying the correct standard de novo,[14] we conclude the Cardholders alleged that

---

[14] Remand is unnecessary here, because we apply equitable estoppel to the facts alleged in the amended complaint. In *Reeves*, we similarly applied the correct equitable estoppel standard after concluding the district court had incorrectly

Wells Fargo and Conduent engaged in interdependent and concerted misconduct and therefore should be compelled to arbitrate their claims against Conduent.

The Cardholders' amended complaint in numerous instances did not distinguish between Wells Fargo and Conduent. It referred to them as "the Defendants" in alleging:

- "Defendants did not make a good-faith investigation into [Cardholders'] dispute." App. at 90, 92;

- "Defendants did not have a reasonable basis for believing that the EPPICard Account transfers were not in error." *Id.*;

- "Defendants never refunded or issued a credit for any of the money stolen from [Cardholders' accounts]." *Id.*;

- "[Cardholders were] damaged by Defendants' misconduct." *Id.* at 90, 93;

- "Defendants were aware of the unauthorized electronic fund transfers, both through consumer complaints and through their own internal controls," "[y]et Defendants continued to hold consumers liable for unauthorized electronic fund transfers in flagrant disregard of federal law." *Id.* at 93;

- "Defendants acts and omissions set forth above constitute violations of the EFTA." *Id.* at 99;

- "Defendants' misrepresentations and material omissions concerning consumer liability for unauthorized transfers and the burden imposed on consumers in disputing such transactions[] violated the UPA." *Id.*

---

predicted whether the Oklahoma Supreme Court would adopt the concerted-misconduct test. *Reeves*, 17 F.4th at 1012-15.

Although the Cardholders also alleged facts specific to Conduent, *see, e.g.*, *id.* at 84, ¶¶ 29-31, the amended complaint is replete with allegations of concerted misconduct by Wells Fargo and Conduent.[15]

Further, the Cardholders' claims against Wells Fargo and Conduent are "based on the same facts." *MS Dealer*, 177 F.3d at 948 (quotations omitted). And pointing to the Wells Fargo/Conduent subcontract, the Cardholders impute Conduent's alleged misconduct in handling Ms. Munoz's and Mr. Tilly's unauthorized transaction claims to Wells Fargo. *See* App. at 86 (asserting "Wells Fargo subcontracted with Conduent to fulfill nearly all aspects of . . . the EPPICard program").

When factual allegations and claims against the signatory and nonsignatory defendants—Wells Fargo and Conduent—are so interdependent, equity supports requiring the signatory plaintiffs—the Cardholders—to arbitrate their claims against

---

[15] *See Hagan v. Greenpoint Credit Corp.*, No. 07-17, 2007 WL 2258866, at *8 (E.D. Ky. Aug. 3, 2007) ("[Because] Plaintiffs collectively refer to all Defendants in the Complaint as simply 'the Defendants' . . . . it appears that [they] are alleging that the Defendants acted in some kind of concerted misconduct."); *Brown*, 462 F.3d at 399 ("As the [plaintiffs] fail to allege tortious acts by [nonsignatory defendants] that are separate and apart from [signatory defendants], we can only conclude that the complaint asserts concerted misconduct by all parties."); *Kronlage Fam. Ltd. P'ship v. Indep. Specialty Ins. Co.*, 651 F. Supp. 3d 832, 841-42 (E.D. La. 2023) (finding concerted misconduct when the plaintiffs' pleading referred to signatories and nonsignatories "collectively and ma[de] all allegations against both" (footnote omitted)); *see also Machado*, 28 N.E.2d at 412 ("In assessing whether a plaintiff has advanced sufficient allegations of concerted misconduct, courts frequently look to the face of the complaint . . . The plaintiffs [here] have lumped the two defendants together, asserting each claim in their complaint against [both] collectively."); *Household Fin.*, 2010 WL 3928070, at *4 (finding concerted misconduct when plaintiffs' allegations "lump[ed] defendants together").

both defendants.  *See Reeves*, 17 F.4th at 1015.  Moreover, doing so avoids the inefficiency of and risk of inconsistent outcomes from conducting separate arbitration and court proceedings.[16]

"The linchpin for equitable estoppel is equity—fairness."  *Id.* at 1013 (quoting *Grigson*, 210 F.3d at 528).  We conclude the Cardholders have alleged that Conduent and Wells Fargo engaged in substantially interdependent and concerted misconduct and that fairness calls for arbitration of the claims against Conduent.[17]  We therefore hold the district court erred in denying Conduent's motion to compel arbitration.

### III.  CONCLUSION

We reverse.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

[16] *See Hemphill*, 206 P.3d at 10 ("Because [plaintiffs] agreed to arbitrate their claims against [signatories], it makes sense to require that the closely connected claims against [the nonsignatory] be arbitrated too.  It would be senseless to have parallel arbitration and court proceedings both devoted to determining [the same facts]."); *Fields v. Herrnstein Chrysler, Inc.*, No. 12CA827, 2013 WL 772822, at *1 (Ohio Ct. App. Feb. 7, 2013) (affirming a motion to compel arbitration based on concerted misconduct when "the claims against the nonsignatories stemmed from the same transaction as the claims against the signatories").

[17] Apart from the formation issue, the Arbitration Agreement plainly encompasses Cardholders' claims.  The Cardholders conceded the same claims as to Wells Fargo were arbitrable, and the district court agreed.